Joseph T. HANSEN, Trustee of Local Union P–9 United Food and Commercial Workers International Union, AFL–CIO & CLC, Plaintiffs,

v.

James V. GUYETTE, Suspended President of Local Union P–9, Lynn Huston, Floyd Lenoch, Peter Winkels, John Weis, Carl Pontius, Kathryn Buck, Jim Retterath, Suspended Executive Board Members of Local P–9, Jeanette Butts and Cindy Rud, Officers of the United Support Group and the United Support Group, Defendants.

LOCAL P–9, UFCW, a labor organization and unincorporated association, James Guyette, Lynn Huston, Kathryn Buck, Peter Winkels, James Retterath, John Weis, Floyd Lenoch, and Carl Pontius, in their individual and official capacities as members of the Executive Board of Local P–9, and on behalf of 975 striking members of Local P–9, Plaintiffs,

v.

William H. WYNN, Jay H. Foreman, Jerry Menapace, William Olwell, Alan Lee, Lewie Anderson, Joseph Hansen, John Mancouso, and Allen Zack, in their individual and official capacities; and United Food and Commercial Workers International Union, a labor organization and unincorporated association, Defendants.

Civ. Nos. 3–86–437, 3–86–0490.

United States District Court, D. Minnesota, Third Division.

July 2, 1986.

Roger A. Jensen, Peterson, Bell, Converse, St. Paul, Minn., Harry Huge, Rogovin, Huge and Lenzner, George R. Murphy, Washington, D.C., for plaintiffs (Hansen, et al.).

Margaret Winter, Winter & Bass, New York City, Ronald L. Rollins, Krause & Rollins, Frank J. Walz, Best & Flanagan, Minneapolis, Minn., for defendants (Guyette, Local P–9, et al.).

DEVITT, District Judge.

The principal issue raised by the trustee's motion dated June 12, 1986 (Clerk's Entry No. II–44), is whether the Austin Labor Center (ALC) and the United Support Group (USG) are "Local P–9 assets" within the meaning of the court's orders of May 9 and June 2, 1986, 636 F.Supp. 907, requiring the delivery of Local P–9's assets to the trustee.

The parties have had the benefit of extensive discovery and the cooperation of other entities in presenting pertinent facts to the court. Briefs, affidavits, and exhibits have been lodged by the trustee, Local P–9 and its suspended officers, and USG. An affidavit has been lodged by counsel for

**904**

Austin Labor Center, Inc. (ALC, Inc.), the title owner of the ALC.

The court's jurisdiction is authorized by the National Labor Relations Act, 29 U.S.C. § 185, and the Labor-Management Reporting and Disclosure Act, 29 U.S.C. §§ 461–66. By its order of June 2, 1986, the court found that federal law and the UFCW International Constitution authorized the International Union to appoint a trustee to conduct Local P–9's affairs and directed Local P–9 and its then officers to deliver custody of P–9's assets to the trustee.

The trustee has been exercising his duties under the trusteeship. The transition appears to have been relatively peaceable except for the two issues which have occasioned this motion. Trustee Hansen claims Local P–9's suspended officers and some P–9 members are withholding custody of ALC and USG from him and attempting to use them as part of a scheme to frustrate operation of the trusteeship. The responding parties claim ALC and USG are separate entities, not P–9 assets, and deny any action or purpose to frustrate the trustee in his duties.

### Austin Labor Center

■ Federal law and the UFCW Constitution authorize appointment of a trustee over a local union to exercise the autonomy that the local was authorized to exercise. 29 U.S.C. § 402(h); UFCW Const. art. 9(H). Trustee Hansen is therefore vested with the same powers of supervision and control over ALC as Local P–9 exercised over it before appointment of the trustee.

The evidence shows that legal title to ALC is in the name of ALC, Inc. This nonprofit corporation was formed under Minnesota law in 1953 and is owned, as it has always been, exclusively by Local P–9 members in good standing. ALC, Inc. Articles of Incorporation VIII § 2. The corporation's only asset is the Austin Labor Center. ALC, Inc. members—that is, Local P–9 members in good standing—elect the corporation's directors, who must also be P–9 members, and ratify leases. *Id.* art. X. The Austin Labor Center has been continu-

ously leased, managed, and controlled by Local P–9 and its officers since it was built in May 1956.

Signal evidence in support of this conclusion shows that Local P–9 has leased ALC since its construction in 1956, first under a written lease for twenty years, and then on a verbal continuation of its terms to the present. The lease covers the entire building. Local P–9 has sublet portions of it from time to time. Presently two local unions, 867, UAW and 6–578, OCAW, occupy offices in the building for $200 per month. On approval of the P–9 board of directors, Corporate Campaign and the USG also office in the ALC. Subtenants of the Center have always paid rent to, and have dealt exclusively with, Local P–9. All of the furnishings and equipment in the building are owned by Local P–9. Local P–9 has always paid all utility bills including water, gas, heat, electric, garbage, and telephone. The janitor was hired by the executive board of Local P–9. The P–9 board approved plans to refurbish the basement area. Local P–9 authorized the installation of a pop machine in the building and collected the profits from its operation. All maintenance and building repairs were performed at the direction of Local P–9.

Other evidence in the record shows that in contemplation of the imminent takeover of Local P–9 by its International Union, and shortly after the takeover, certain Local P–9 officers and members engaged in a series of manuevers to impede the takeover and frustrate the trusteeship. These efforts included a hurriedly staged election of a new board of directors of the subsidiary corporation (ALC, Inc.) holding legal title to ALC. Six of the twelve new directors are suspended officers of Local P–9: James Guyette, Lynn Huston, Floyd Lenoch, James Retterath, John Weis, and Peter Winkels. No official corporate minutes of this event are recorded but written notes reflect it. The directors unilaterally attempted to assume authority to lease ALC office space in June 1986. The new board of directors is also attempting, without the required approval of ALC, Inc's

members, to decree a new lease for Local P-9's occupancy of ALC, increasing the monthly rent almost tenfold ($326 to $3,000) in a manifest effort to prevent the trustee's effective occupancy of ALC. During the strike against Hormel, Local P-9 did not pay rent but continued to receive payments from subtenants. In January 1986, the new board, ignoring Local P-9's leasehold interest in the entire premises, attempted to decree a lease between ALC, Inc. and the United Support Group for the nominal rent of $12 per year, clearly facilitating that group's efforts to continue strike-related activities. Other activities of these suspended Local P-9 officers and several other P-9 members reflect a bad faith purpose antagonistic to the trustee's peaceable custody of the Labor Center.

Trustee Hansen is vested with a leasehold interest in the ALC with the same powers of supervision and control over the ALC as Local P-9 exercised before Hansen's appointment as trustee. Local P-9 officers and members, through the ALC, Inc. board of directors, may not frustrate or impede the trustee's performance of his duties on behalf of P-9 members. *See generally* 1 C. Van Swearingen, *Fletcher Cyclopedia of the Law of Private Corporations* § 41.10 (rev. ed. 1983).

The court concludes that Local P-9's leasehold interest in ALC has been shown to be a Local P-9 asset and subject to the same complete supervision and control by the trustee as was previously exercised by Local P-9 and its officers and members. At the proper time, the court will entertain motions for the imposition of sanctions where appropriate.

### United Support Group

The evidence submitted on this issue indicates that the United Support Group initially acted independently of Local P-9 as an unincorporated association of volunteers sympathetic to Local P-9 strikers. As the United Support Group expanded its fundraising activities, which coincided with commencement of Local P-9's strike against Hormel in August 1985, a closer interrelationship between the two developed.

The trustee contends that this entitles him to control of USG as a Local P-9 asset. Through a joint affidavit of United Support Group members, the Group submits that it is a separate entity and not a Local P-9 asset. While they admit they share the same interests as Local P-9, they claim the Support Group has conducted its own affairs without direction or control by Local P-9 or Ray Rogers. The trustee disputes this.

The United Support Group was formed in October 1984 to raise money for a Local P-9 food shelf and informational bannering about the Hormel—Local P-9 dispute. USG maintains its own financial records and accounts for which its members are sole signatories. It raised money through bake sales, raffles, and other events. Local P-9 provided USG with furnished space in the Austin Labor Center, telephone service, and a bulk rate mail permit.

In August 1985, the USG expanded its fundraising efforts and opened several "specific-purpose" accounts at the Hormel Credit Union. Initial deposits were made in the "P-9 Emergency & Hardship Fund" and then transferred to specific accounts. The signatories of these new accounts, like the original account, were USG members.

Despite the continued separate maintenance of these accounts, the minutes of Local P-9 executive board meetings reveal a marked change in the Group's working relationship with the Local when it went on strike. The Support Group continued to occupy substantial space furnished by Local P-9 at nominal cost and with the same telephone and mailing privileges. Additionally, however, Local P-9 board minutes, the USG joint affidavit and James Guyette's affidavit attest to Local P-9's significant and increased influence over the Group. It appears that Local P-9 had the power to approve or disapprove the contents of mailings. It also made decisions regarding USG activities, sometimes without communicating its decisions to the Group. Local P-9 members, with board approval, actively

participated in and funded many of the fundraising efforts. The USG admits that it worked closely with Ray Rogers, Corporate Campaign, and Local P–9 in preparing two significant mass mailings for the "Adopt a P–9 Family Fund" and the "Solidarity City" rally.

■ A voluntary group of citizens has a first amendment right to advocate and work for any proper cause which may motivate it. The USG members properly could organize and support Local P–9's efforts in its controversy with Hormel. Because many of them were retired employees of Hormel, friends, and family members of strikers, it is understandable for them to have done so.

■ It would be incongruous, therefore, to consider categorizing USG itself as a "Local P–9 asset" subject to the control and supervision of the trustee, when the present objectives of USG and the trustee are antagonistic. The trustee wants to settle the strike. The USG wants to continue its support of the suspended Local P–9 officers and members in carrying on the strike.

■ If the motion be viewed as one to find that only the property of USG is a Local P–9 asset, then we must consider the two principal categories of property possessed by USG. The first is its store of caps, buttons, banners, T-shirts, toys, grocery products and similar articles with which USG carries on its welfare and advocacy programs in support of the strikers. These obviously should not pass to the custody of the trustee as assets of Local P–9, because it is property employed by USG in advancing its legitimate objectives.

■ We come to the several accounts in the Hormel Credit Union. On the basis of the evidence submitted by affidavits and exhibits, a précis of which is recited above, it is impossible to draw the conclusion that the accounts are, or are not, "Local P–9 assets." On balance, the evidence is about even. It is quite clear that in the beginning USG acted on its own. Shortly after the strike, Local P–9 officers and members exercised an increasing influence over USG activities. At some time, such influence and direction may have reached the point where Local P–9 dominated USG's activities. But even if this were proved, there is no showing, for any specific time, of the source of the funds or the purpose of their expenditure, the purpose for transfer of funds between accounts, the current balances, or any other detail from which a meaningful reconstruction could be effected. Without these details, we would be unable to make an allocation of the funds as USG or Local P–9 assets for a period when Local P–9 may have dominated USG activities. The sum of it is that the trustee has not proved by the greater weight of the evidence that the present Credit Union Account balances are Local P–9 assets.

Issues like this are not effectively resolved by contempt motions. The proper custodian of bank balances claimed by competing claimants is best, and normally, resolved by interpleader-type proceedings such as is authorized by both federal and Minnesota statutes and rules. *See* 28 U.S.C. § 1335; Fed.R.Civ.P. 22; Minn.R. Civ.P. 22; 7 C. Wright & A. Miller, *Federal Practice and Procedure* § 1701–20 (1972). It is suggested the parties may want to employ such a procedure for direct and effective resolution of this issue.

IT IS ORDERED that:

Local P–9, its suspended officers and executive board members, members, agents, servants, employees, and attorneys are directed: forthwith, to recognize Joseph T. Hansen as the legally appointed trustee of Local P–9 and to deliver to him custody and control of the Austin Labor Temple and to permit him peaceably to manage it and to conduct Local P–9's affairs as trustee.

This preliminary injunction shall remain in full force and effect until further order of the court.

Counsel for Local P–9 are directed to communicate this order forthwith to all suspended officers and to all members of Local P–9, and counsel for USG is directed to communicate this order forthwith to all

USG officers and members, and all counsel shall promptly file evidence of compliance with this direction.